## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**RAYMOND ALBERTH,**

  **Plaintiff,**

  **v.**                                      **Case No. 19-CV-62**

**SOUTHERN LAKES PLUMBING & HEATING, INC.
and SCOTT R. PLUCINSKI,**

  **Defendants.**

## DECISION AND ORDER ON PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

Raymond Alberth sues his former employer, Southern Lakes Plumbing & Heating, Inc. ("Southern Lakes"), and its owner, Scott R. Plucinksi, for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Compl., Docket # 1.) Alberth alleges that Plucinski failed to provide information about an employee welfare benefit plan as required by ERISA, and to pay benefits due under that plan. (*Id.*) Before me is Alberth's motion for summary judgment. (Docket # 19.) For the reasons below, Alberth's motion will be granted in part and denied in part.

## FACTS

Plucinski started Southern Lakes in 1982. (Plaintiff's Amended Proposed Findings of Fact[1] ("PPFOF") ¶ 1, Docket # 41 and Defendants' Response to PPFOF ("Defs.' Resp.") ¶ 1, Docket # 29.) Plucinski exercised discretionary control over the purchase, administration,

---

[1] Along with his reply brief, Alberth filed an expedited motion to amend his proposed findings of fact to correct one typo in a citation. (Docket # 37.) Defendants filed no response to the expedited motion. After the response deadline under Civ. L. R. 7(h) passed, I granted the motion by text order and Alberth filed his amended proposed findings of fact. (Docket # 41.)

management, and assets of employee life insurance policies. (PPFOF ¶ 5 and Defs.' Resp. ¶ 5.) Plucinski testified that Southern Lakes has never had more than fifty employees. (Decl. of Alan Olson ("Olson Decl.") Ex. 11, Dep. of Scott R. Plucinski ("Plucinski Dep.") at 7–10, Docket # 42-10.)

Alberth was employed by Southern Lakes for over twenty years, from 1997 to September 2018. (PPFOF ¶ 2 and Defs.' Resp. ¶ 2.) Alberth was Southern Lakes' HVAC manager. (PPFOF ¶ 3 and Defs.' Resp. ¶ 3.) Other high-level employees included Jeff Flitcroft, who manages Southern Lakes' plumbing department (PPFOF ¶ 18 and Defs.' Resp. ¶ 18), and Steven Morgan, a plumbing supervisor (PPFOF ¶ 25 and Defs.' Resp. ¶ 25).

In 2004, Plucinski met with insurance agent Karen Kallem and thereafter purchased life insurance policies for four employees: Alberth, Flitcroft, Morgan, and bookkeeper Tammy Neiger, who is Alberth's sister. (PPFOF ¶¶ 6, 11, 20–21, 25 and Defs.' Resp. ¶¶ 6, 11, 18, 20–21, 25; Defendants' Proposed Findings of Fact ("DPFOF") ¶ 2, Docket # 29 and Plaintiff's Response to DPFOF ("Pl.'s Resp.") ¶ 2, Docket # 36; Decl. of Tammy Neiger ("Neiger Decl.") ¶ 2, Docket # 25.) The policies had various effective dates in early 2005. (PPFOF ¶ 11, 12, 21, 42 and Defs.' Resp. ¶ 11, 12, 21, 42.) Plucinski allowed the employees to designate the beneficiaries of their policies. (Defs.' Resp. ¶¶ 20, 25; Olson Decl. Ex. 2, Dep. of Karen Kallem ("Kallem Dep.") at 11–13, Docket # 42-2; Olson Decl. Ex. 3, Kallem Dep. Ex. 2 at 13, Docket # 42-3 (naming Michelle Alberth as the beneficiary of the policy insuring Alberth).) Southern Lakes paid all premiums (PPFOF ¶ 9 and Defs.' Resp. ¶ 9) and Plucinski was the named owner on all the policies (Plucinski Dep. Ex. 1, 7, 8, 10, Docket # 42-11, 42-13–42-15).

Kallem described these life insurance policies as "golden handcuffs" (PPFOF ¶ 10 and Defs.' Resp. ¶ 10) and Plucinski intended them to incentivize employees to remain at Southern Lakes. (PPFOF ¶ 44 and Defs.' Resp. ¶ 20, 40; Olson Decl. Ex. 17, Dep. of Raymond Alberth ("Alberth Dep.") at 11:3–4, Docket # 42-17.) At least some of the employees insured under these policies understood that Plucinski offered this benefit to certain "key employees," which they understood themselves to be. (PPFOF ¶ 26; Alberth Dep. at 11:3–4; Neiger Decl. ¶ 5; *see also* PPFOF ¶¶ 19–20.) It is undisputed that Plucinski refers to Flitcroft as a "key employee." (PPFOF ¶ 19 and Defs.' Resp. ¶ 19.) However, Kallem testified that although Plucinski referred to these policies as "key man" policies, they differed from typical "key man" policies in that the beneficiary was not the company, but the employee's named beneficiary. (Kallem Dep. at 11–12, 21, 27–28.)

The insured employees apparently understood the fact that these life insurance policies would accumulate a cash value over time; it is undisputed that Morgan, at least, understood this. (PPFOF ¶ 27 and Defs.' Resp. ¶ 27.) All the insured employees claim to have understood that if they remained with the company for a certain period of time, they would be entitled to the cash value of their policies. (Alberth Dep. at 10:5–13; Olson Decl. Ex. 1, Dep. of Jeffrey W. Flitcroft ("Flitcroft Dep.") at 9:3–6, Docket # 32-1; Olson Decl. Ex. 4, Dep. of Steven D. Morgan ("Morgan Dep.") at 13:24–14:2, Docket # 32-4; Neiger Decl. ¶ 5.) Alberth and Neiger understood that period to be five years; Flitcroft could not recall an exact time frame. (Alberth Dep. at 10:5–13; Neiger Decl. ¶ 5; Flitcroft Dep. at 9:7–8.) Plucinski denies having any conversation with any employee regarding receiving the cash value of the policy and denies any such agreement. (Defs.' Resp. ¶¶ 13, 15, 17, 20, 23, 28, 43–44, 52.)

By late 2010—more than five years after the policy went into effect and apparently not long before Morgan left his employment at Southern Lakes—the policy insuring Morgan had accumulated a cash value of over $7,000. (PPFOF ¶ 31 and Defs.' Resp. ¶ 31.) When Morgan asked the company for the cash value of the policy, the Plucinskis (Scott and his wife Patricia) wanted Morgan to take a loan against the policy. (PPFOF ¶ 32 and Defs.' Resp. ¶ 32.) However, the Plucinskis eventually "changed course" and Patricia filled out a cash surrender form for the policy so that the cash could be taken out, writing Plucinski's initials and name on the form.[2] (PPFOF ¶ 35, 38 and Defs.' Resp. ¶ 35, 38.) Morgan was not aware of that document. (PPFOF ¶ 36, Defs.' Resp. ¶ 36.) Patricia wrote a check to Morgan for an amount equal to the cash value of the policy minus a personal debt Morgan owed to Plucinski. (PPFOF ¶¶ 29–30, 34, 38–39 and Defs.' Resp. ¶¶ 29–30, 34, 38–39.)

Another employee, Jesse Adams, stated that Plucinski provided him with a life insurance policy he referred to as "golden handcuffs" and told him that after a certain number of years of employment with the company (Adams could not remember how many), the cash value of the policy would belong to him. (Decl. of Jesse Adams ("Adams Decl.") ¶ 3, Docket # 24.) However, the Defendants aver that they have no record of such a policy insuring Adams. (Defs.' Resp. ¶ 16.)

Alberth quit his employment at Southern Lakes in September 2018. (DPFOF ¶ 4 and Pl.'s Resp. ¶ 4.) Throughout his employment, Alberth never requested the cash value of the life insurance policy or requested that ownership of the policy be assigned to him. (DPFOF ¶¶ 5–6 and Pl.'s Resp. ¶¶ 5–6.) Alberth requested the cash value of the policy only after he left Southern Lakes. (DPFOF ¶ 9 and Pl.'s Resp. ¶ 9.) Alberth went through a divorce in

---

[2] While the Defendants object to Alberth's referring to this document as "forged," they do not dispute that Patricia wrote Plucinski's initials and name without his knowledge. (Defs.' Resp. ¶ 35.)

2015 or 2016 and testified that he did not recall if the policy was listed as an asset. (DPFOF ¶¶ 7–8 and Pl.'s Resp. ¶¶ 7–8.)

Some time in October 2018—after he left Southern Lakes—Alberth emailed Plucinski and/or his attorney requesting a copy of the insurance policy documents, though the date of the earliest such email is disputed. (PPFOF ¶¶ 47–48 and Defs.' Resp. ¶¶ 47–48.) On November 1, 2018, Plucinski's attorney responded to Alberth's email, stating that "we will not be sending any policy information." (PPFOF ¶ 48 and Defs.' Resp. ¶ 48.) The full email, later copied into an email from Plucinski's counsel to Alberth's counsel, read:

> Thank you for your emails. I am responding on behalf of Southern Lakes Plumbing & Heating, Inc. (Southern Lakes). I have been gathering some information regarding your "requests" for copies of a life insurance policy that you were the beneficiary on while employed at Southern Lakes. Here is what I have determined:
>
> 1. You were an at-will employee at Southern Lakes.
> 2. While employed at Southern Lakes, there was a life insurance policy that was owned by Scott Plucinski where you are the primary insured and you were allowed to name beneficiaries on that policy.
> 3. You do not and have not ever owned that policy, nor have you paid any premiums on said policy.
> 4. You are no longer employed at Southern Lakes.
> 5. You never have had any contractual arrangement with Southern Lakes that provided you were "entitled" to the life insurance benefit that Southern Lakes chose to provide. Likewise, you have no contractual arrangement that provides upon your termination you are entitled to a transfer of ownership of any policy of insurance or entitled to the cash value of any such policy. What happened with other employees is irrelevant.
>
> Based on the above information, your demands for copies of the policies are misplaced. It is not nor has it ever been "your policy". Thus we will not be sending any policy information.
>
> [. . .]
>
> If you have formally retained an attorney and would rather I communicate through him/her please let me know. Thank you.

(Olson Decl. Ex. 18, Olson Aff. Ex. 1 at 2–3, Docket # 42-6.)

On November 9, 2018, Alberth's counsel emailed Plucinski's counsel requesting "copies of the policy, plan document, summary plan document, and all communications regarding the policy." (*Id.* at 4.) Plucinski's counsel responded by copying his correspondence to Alberth and stating,

> Although not required to do so, I am attaching a copy of the policy data page for the life insurance policy in question. As you can see, Mr. Alberth is not the Owner of the policy, but merely the Insured. Mr. Alberth has no rights to this policy. I will not be providing any of the other documents you requested.

(*Id.* at 3.) Albeth's counsel responded,

> The issue is not who bought the policy, but rather what benefits belonged to Mr. Alberth. In the interest of avoiding litigation, I would have a better understanding of the parties' legal rights and duties upon review of the documents.

(*Id.* at 1–2.) Counsel for Plucinski replied,

> Mr. Alberth did not own the policy and thus has no rights to the policy or its benefits unless he had died at which time the beneficiary he named would have received the death benefit. As the Owner of the policy, Mr. Plucinski has all the rights to the policy while the Insured (Mr. Alberth) is alive. Mr. Alberth was an "at will" employee who quit his employment with Southern Lakes, so unless you can show me some contractual rights that Mr. Alberth claims to have to this policy, there is really nothing else to discuss. Thanks.

(*Id.* at 1.)

Alberth filed this lawsuit on January 10, 2019. (Compl., Docket # 1.) The Defendants provided Alberth a copy of the life insurance policy and related documents on April 16, 2019 in response to discovery requests. (PPFOF ¶ 51 and Defs.' Resp. ¶ 51.)

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)). In evaluating a motion for summary judgment, I must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

I must also view the evidence presented through the prism of the substantive evidentiary burden. *Anderson*, 477 U.S. at 254. Where, as here, the party moving for summary judgment also bears the burden of persuasion at trial (i.e., because the movant is the plaintiff), the movant must establish each and every essential element of his claim. *See McKinney v. Am. River Transp. Co.*, 954 F. Supp. 2d 799, 803 (S.D. Ill. 2013) (citing *Celotex*, 477 U.S. at 32); *see also Lewis v. Kordus*, No. 09-CV-138, 2010 WL 3700020, at *1 (E.D. Wis. Sept. 14, 2010) ("[W]here the moving party bears the burden of proof at trial, he can prevail only by proving every element of his case with evidence so compelling that no reasonable

jury could return a verdict for the non-moving party."). This differs from the usual summary judgment motion filed by a defendant (who does not bear the ultimate burden of persuasion at trial), who can prevail just by showing an absence of evidence to support any essential element of the non-movant's case. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013).

## ANALYSIS

Alberth moves for summary judgment in his favor on his two ERISA claims: (1) under § 502(a)(1)(A), that the Defendants failed to provide him with plan-related documents[3] (Compl. ¶¶ 22–24), and (2) under § 502(a)(1)(B), that he is entitled to the cash value of the insurance policy (*id.* ¶¶ 25–26). The Defendants maintain that ERISA does not apply because the life insurance policy Plucinski purchased for Alberth was not part of an ERISA plan, and even if so, Alberth is not entitled to the damages he seeks. (Defs.' Br., Docket # 28.) Plucinski's primary argument is that he entered into *ad hoc* agreements with individual employees that were not part of any ERISA plan.

### 1. ERISA

Congress enacted ERISA in response to what it saw as the widespread problem of employee benefit plans that lacked "adequate safeguards," resulting in employees and their beneficiaries losing anticipated benefits. 29 U.S.C. § 1001(a). These include both "employee welfare benefit plans" and "employee pension benefit plans." 29 U.S.C. § 1002(3). On such plans, ERISA imposes disclosure and reporting requirements, sets standards of conduct for

---

[3] In the complaint, Alberth also argues that Plucinski's failure to maintain reasonable claim procedures violated ERISA and relevant regulations. (Compl. ¶¶ 23–24.) Although Alberth mentions this issue in his brief, along with Plucinski's failure to establish the plan pursuant to a written instrument as required (Pl.'s Br., Docket # 20 at 8–9), he does not argue that he is entitled to relief for these alleged violations and I will not address them here.

fiduciaries and minimum standards of funding, and requires vesting of accrued benefits. 29 U.S.C. § 1001(b). It also provides for remedies, sanctions, and access to the federal courts, including civil actions by participants, beneficiaries, and fiduciaries who seek to enforce the terms of the plan. 29 U.S.C. §§ 1001(c), 1132(a)(3)(B)(ii).

Alberth argues that the life insurance policy insuring him was part of an "employee welfare benefit plan" and therefore subject to ERISA.[4] (Docket # 20 at 3–8.) Alberth contends that although the plan was not in writing, the surrounding circumstances are sufficient to indicate that such a plan was established. *Id.* at 5–8 (citing *Brines v. XTRA Corp.*, 304 F.3d 699, 702 (7th Cir. 2002); *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 739 (7th Cir. 1986); *Fiene v. V & J Foods, Inc.*, 962 F. Supp. 1172, 1178–79 (E.D. Wis. 1997) (citations omitted)).

In contrast, Plucinski argues that no ERISA plan was created; rather, Plucinski believes he entered into separate *ad hoc* agreements with Alberth and a number of other employees. (Docket # 28 at 5–9 (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982); *Sandstrom v. Cultor Food Science, Inc.*, 214 F.3d 795, 797 (7th Cir. 2000); *Diak v. Dwyer, Costello & Knox, P. C.*, 33 F.3d 809, 812 (7th Cir. 1994) ("[E]mployer's decision to extend benefits to certain employees does not compel the conclusion that it had established a pension plan."); *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 847 (6th Cir. 2006).)

---

[4] The Defendants state that Alberth alleges two separate benefits, a death benefit (a "welfare benefit" under ERISA) and a deferred compensation benefit (a "pension benefit" under ERISA) (Docket # 28 at 6), but this is not so. Alberth alleges a single employee welfare benefit—the life insurance policy—that could be claimed in one of two ways: upon the death of the employee, or upon a tenured employee's request for the cash value of the policy. (Pl.'s Br. at 3–9.) Thus, I decline to address Defendants' arguments insofar as they characterize Alberth's claim as one for an employee pension benefit.

An agreement to provide an employee benefit qualifies as an "employee welfare benefit plan" under ERISA if it is "(1) a plan, fund or program, (2) established or maintained, (3) by an employer or by an employee organization . . . (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits . . . , (5) to participants or their beneficiaries." *Ed Miniat,* 805 F.2d at 738 (citing 20 U.S.C. § 1002(1); *Donovan*, 688 F.2d at 1370–71).

The last three elements are met in this case: the life insurance policy was purchased by Alberth's employer in order to provide a death benefit for Alberth's named beneficiary. There is little doubt about the second element, that some scheme was "established or maintained," as Plucinski purchased the policy and paid premiums on it for well over a decade. *Cf. Brines*, 304 F.3d at 701 ("It just has to exist, in the sense that . . . it was intended to be in effect, and not just something for future adoption.") (internal citation omitted).[5] Plucinski's primary argument is on the first factor: that there was no "plan."

Because ERISA's relevant definitions all contain the word "plan," "courts must look beyond the statutory language to ascertain what constitutes an ERISA plan." *Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997) (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987)), *abrogated on other grounds by Int'l Union of Operating Eng'rs v. Rabine*, 161 F.3d 427 (7th Cir. 1998). An ERISA plan is one with both a "continuing administrative scheme" and "reasonably ascertainable terms." *Id.* (citing *Fort Halifax Packing Co.*, 482 U.S. at 12; *Diak*, 33 F.3d at 812). In this case, there was undoubtedly an ongoing administrative scheme, with

---

[5] Plucinski concedes that the lack of a written instrument alone is no obstacle to finding an ERISA plan (Defs.' Br. at 6), for although ERISA requires plans to be in writing, 29 U.S.C. § 1102(a)(1); *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995), courts will enforce an unwritten plan with reasonably ascertainable terms on the basis that "failure to comply with that requirement should not redound to the company's benefit," *Brines*, 304 F.3d at 701 (internal citations omitted).

Southern Lakes paying regular premiums on the policy for approximately fourteen years. Plucinski argues, however, that the terms of any such plan were not "reasonably ascertainable." (Defs.' Br. at 5–9.) To decide whether terms are "reasonably ascertainable," the Seventh Circuit has adopted the four-part test outlined in *Donovan*: whether from the surrounding circumstances, a reasonable person could ascertain the (1) intended benefits, (2) beneficiaries, (3) source of financing, and (4) procedures for receiving benefits. *Diak*, 33 F.3d at 812 (citing *Donovan*, 688 F.2d at 1373 (11th Cir. 1982)).

The first *Donovan* factor requires that a reasonable person could ascertain the intended benefits from the surrounding circumstances. Here, the policy insuring Alberth shows a death benefit of $526,855. (Docket # 42-13.) This benefit is not only ascertainable but ascertained, satisfying the first *Donovan* factor. The Defendants argue that this *Donovan* factor cannot be satisfied because there is a factual dispute over whether the agreement also included a cash value payout option after five years. (Defs.' Br. at 7.) But the presence or absence of a cash value payout option does not change the fact that there was a death benefit, so *Donovan* is satisfied regardless. Furthermore, terms need not be undisputed to be ascertainable; there must only be evidence from which a reasonable person could ascertain them. *See Diak*, 33 F.3d at 812 (stating that in order to find the existence of an ERISA plan, "there must be some evidence in the record from which the court can ascertain the benefits due under a plan"). The question is whether, if the court were to find that Alberth is entitled to benefits, there is sufficient evidence from which the court could calculate them. In this case, a factfinder assessing all the evidence, including the credibility of the witnesses, could ascertain whether the agreement between Plucinski and Alberth included the cash value payout term, and if so, the amount due Alberth.

The second *Donovan* factor requires circumstances from which a reasonable person could ascertain the intended beneficiaries. The Defendants contend that Alberth has presented no evidence showing the intended beneficiaries and how those beneficiaries became eligible for the plan. (Defs.' Br. at 7 (citing *Brundage-Peterson v. Compcare Health Servs. Ins. Corp.*, 877 F.2d 509, 510 (7th Cir. 1989) (finding that a plan covering all employees except those who had been employed fewer than thirty days was an ERISA plan).) The Defendants protest that Plucinski has had other "key employees" to whom he has not offered the death benefit, and that there is no evidence of a "specific scheme or method" or "systematic plan" for determining which employees received the benefit. (*Id.* at 8.) But the question is not whether the employer had consistent criteria for determining eligibility; it is whether we can ascertain who was eligible. *See Diak*, 33 F.3d at 812 (explaining that lack of evidence about who was eligible for a pension benefit rendered it unascertainable). In this case, the life insurance policy insuring Alberth and naming his designee as the beneficiary show that Alberth was a participant, satisfying this *Donovan* factor. It is unclear at this stage if Plucinski offered identical terms to all the insured employees and Alberth was just one of several participants in that plan, or whether each employee had an individual agreement with Plucinski that constituted a single-employee ERISA plan. *See Cvelbar*, 106 F.3d at 1376 (explaining that ERISA can encompass agreements between an employer and a single employee). But either way, Alberth was a participant, and a reasonable factfinder could discern whom else the plan might have included. Thus, the second *Donovan* factor is satisfied.

The third *Donovan* factor requires that a reasonable person could ascertain the source of financing for the plan. Plucinski does not contest that this element of the *Donovan* test is

met, and rightly so, as Plucinski purchased a life insurance policy and Southern Lakes paid its premiums. The policy documents are in the record. No more is required.

The fourth *Donovan* factor requires that a reasonable person be able to determine the procedure for obtaining the benefit. Here, the procedure for enrolling appears to have been quite simple: Plucinski offered the life insurance benefit and Alberth agreed and designated a beneficiary. Thereafter, the procedure for making a claim was straightforward: policy documents indicate that payment of the death benefit would be made to that beneficiary upon proof that the insured had died while the policy was in force and before the maturity date. (Kallem Dep. Ex. 2 at 25, Docket # 42-3.) As for the alleged cash value payout option, the events surrounding Morgan's apparent withdrawal of the cash value are evidence that a tenured employee could request the cash value from the Plucinskis, who would then use the insurance company's form to surrender the policy in exchange for the cash value and write a check to the employee. The fact that some aspects of these procedures are disputed does not make these procedures unascertainable, as there is evidence from which a factfinder could resolve the issue. *Cf. Diak*, 33 F.3d at 813 (pointing to the *lack of evidence* as to how certain retirees applied for benefits or why other retirees did not receive benefits).

Applying the *Donovan* factors, I conclude that there was an ERISA "plan" in place. Plucinski's argument that he simply entered into "*ad hoc* agreements" (Defs.' Br. at 6–7 (citing *Diak*, 33 F.3d at 812)) is unpersuasive. Comparison with *Diak*, the main case Plucinski cites for support, is instructive. In *Diak*, a retired employee sued his former employer under ERISA to obtain pension benefits, pointing to the fact that the employer had made pension payments to four other individuals. The court held that there was no "plan" because the circumstances failed several elements of the *Donovan* test. Of the

13

approximately twenty-five employees who left the company, only four received any post-employment benefit; pension payments were determined on an individual *ad hoc* basis upon retirement of the employee; each individual received a different package, ranging from $75/month to $2500/month; and one received only health benefits, not a pension. 33 F.3d at 811–12. The court reasoned, "it is difficult to divine a formula at work in this distribution of payments," contrasting this case with others in which "the amount of benefits due or the method of calculating benefits was clear on the face of the record—the only question was whether the plan had been adopted." *Id.* (citing *James v. National Business Systems*, 924 F.2d 718, 719 (7th Cir. 1991) (benefit amount ascertainable from draft proposed payment schedule); *Moeller v. Bertrang,* 801 F. Supp. 291 (D.S.D. 1992) (undisputed that all employees working five years would receive a lump sum at retirement at age 62 of $1,000 for each year of service); *Hollingshead v. Burford Equipment Co.*, 747 F. Supp. 1421 (M.D. Ala. 1990) (benefit amount ascertainable from board meeting minutes that included schedule of benefits commensurate with years of service).)

There are undoubtedly similarities between *Diak* and this case. In both, the employer extended a benefit to a small number of employees and exercised discretion over which employees were eligible. But Alberth is not analogous to the plaintiff in *Diak*, who argued that he *should* be eligible for a benefit. Alberth actually *was* eligible for a benefit—the death benefit, if nothing else. In this way, he is analogous to the four non-plaintiff employees in *Diak* who actually were offered pension benefits. While the *Diak* court found that the benefits offered to those employees were not part of any ERISA plan that would have entitled the *plaintiff* to benefits, it did not address whether those individual arrangements could be construed as single-employee plans. That question was irrelevant, because any

14

such plan would not have included the plaintiff; the only way the plaintiff could prevail was to show there was a multi-employee plan. Here, even if there was no multi-employee plan, there was at least a single-employee arrangement covering Alberth. The record shows that he was eligible and enrolled; the only question is about the terms of the arrangement, and a factfinder can determine those. Thus, this is not a case in which the court "could not begin to fashion appropriate relief" because of the "*ad hoc*" nature of the agreement. *Diak*, 33 F.3d at 813.

In sum, on the undisputed facts, the life insurance policy insuring Alberth was part of an "employee welfare benefit plan" governed by ERISA. The arrangement between Plucinski and Alberth, though "barebones," *see Brundage–Peterson* 877 F.2d at 510–11, was a "plan" because it included an ongoing administrative scheme and reasonably ascertainable terms, and it met all the other requirements of an "employee welfare benefit plan" under 20 U.S.C. § 1002(1). Furthermore, finding that this arrangement constituted an ERISA plan conforms with ERISA's goal to protect employees' expectations of future benefits, which the death benefit promised regardless of whether Alberth was entitled to the cash value after five years.

### 2. First Claim for Relief: § 502(a)(1)(A)

Alberth argues that he is entitled to statutory penalties of $15,950 due to the Defendants' failure to comply with Alberth's request for plan documents. (Pl.'s Br. at 10–12.) Alberth asserts that he is entitled to the maximum statutory penalty of $110 a day and calculates 145 days from his initial request for documents on October 22, 2018 to the date on which the Defendants provided Alberth with a copy of his life insurance policy and related documents on April 16, 2019 in response to Alberth's discovery requests. (*Id.* at 12.)

Section 502(c) of ERISA, 29 U.S.C. § 1132(c), requires plan administrators to provide information requested by plan participants or beneficiaries within thirty days of such request or face a statutory penalty of up to $100 per day. 29 U.S.C. §§ 1024(b)(4), 1132 (c)(1)(B). By regulation, the maximum penalty has increased to $110 per day. *Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781, 793 (7th Cir. 2009) (citing 29 C.F.R. § 2575.502c–3). Section 502(a)(1)(A) authorizes a plan participant or beneficiary to sue for these penalties if a plan administrator violates § 502(c). 29 U.S.C. § 1132(a)(1)(A). The decision to impose statutory penalties is committed to the discretion of the district court. *Harsch v. Eisenberg*, 956 F.2d 651, 662 (7th Cir. 1992). In exercising this discretion, the judge may—but need not—consider whether there is any provable injury. *Harsch*, 956 F.2d at 662 (citing *Ziaee v. Vest*, 916 F.2d 1204, 1210 (7th Cir. 1990)). The court must make factual findings supporting any such penalty it imposes. *Ziaee*, 916 F.2d at 1210–11.

Plucinski does not dispute that he refused to comply with Alberth's written request to furnish information. He argues only that he was not required to do so because there was no ERISA plan. (Defs.' Br. at 28.) Although Plucinski has effectively conceded liability in the event that there was an ERISA plan—and there was—I pause to consider whether the fact that Alberth's employment had terminated when he made the request affects Plucinski's liability. Only a "participant or beneficiary" of a plan may assert a claim under 29 U.S.C. § 1132(c)(1)(B). ERISA defines a "participant" as "any employee or former employee . . . who is or may become eligible to receive a benefit." 29 U.S.C. § 1002(7). The Supreme Court has interpreted the definition broadly to include former employees "'who have a colorable claim to vested benefits.'" 29 U.S.C. § 1002(7). *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 789–90 (7th Cir. 1996) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 117–18 (1989)). The life insurance policy insuring Alberth remained in force even after Alberth's employment ended (Plucinski Decl. ¶ 20), giving him at least a colorable claim that he was or would be entitled to benefits, and placing him comfortably within the definition of a "participant" for ERISA purposes.

The Defendants assert that no or minimal penalty should apply for a number of reasons. They assert that Alberth's request came after he had left the company and therefore took them by surprise; that there was no bad faith because they did not believe Alberth had a right to inspect the requested documents, as Alberth did not own the policy and they believed there was no ERISA plan in place; and Alberth was not prejudiced by the delay because he was provided with a policy data information sheet showing Plucinski as the owner, and the policy remains in place. (Defs.' Br. at 10.)

The Defendants identify no evidence in the record indicating that surprise was a factor in the Defendants' refusal to give Plucinski information about the life insurance policy insuring him. In his email to Alberth, counsel for Plucinski gave the following reasons for the refusal: Alberth was an at-will employee; the life insurance policy was owned by Plucinski; it insured Alberth "[w]hile employed at [Southern Lakes]"; Alberth did not own the policy and had paid no premiums on it; Alberth was no longer employed at Southern Lakes; and Alberth never had a contract with Southern Lakes entitling him to the life insurance benefit, transfer of ownership of that policy, or the cash value of the policy. (Olson Decl. Ex. 1 at 2–3.) In his email to Alberth's counsel, Plucinski's counsel reiterated that "Mr. Alberth is not the Owner of the policy, but merely the Insured. Mr. Alberth has no rights to this policy." (*Id.* at 3.) Albeth's counsel responded that review of the documents would allow him to better understand the parties' legal rights and help avoid litigation. (*Id.*

17

at 1–2.) Counsel for Plucinski again responded that all the rights to the policy belonged to Plucinski while Albert was alive, and that Alberth was an "at will" employee who quit his employment with Southern Lakes and had no contractual rights to the policy. (*Id.* at 1.)

None of these explanations provides a compelling justification for denying Alberth information about the policy. Although Plucinski was the owner of the policy and paid the premiums on it, Alberth had a legitimate interest in it: the policy named Alberth as the insured and his designee as the beneficiary, even after Alberth left Southern Lakes. The idea that Alberth could not possibly have any rights regarding the policy just because he had been an at-will employee, because he was no longer employed at Southern Lakes, or because any agreement had not been written down, is legally erroneous. The delay in producing the documents did prejudice Alberth to some degree; as counsel for Alberth indicated, the policy information was important to understand the parties' rights so that Alberth could make decisions such as whether to litigate. For example, the policy documents contain information on calculating the cash value of the policy—information that would have been useful to Alberth in determining whether it was worth hiring a lawyer and/or pursuing a lawsuit to try to recover that sum. It is also troubling that in responding to Alberth's request for documents, counsel for Plucinski inserted a long paragraph "[i]n addition" alleging that Alberth had removed confidential company records from Southern Lakes when he left and used them to bid on a project for his new employer—a direct competitor with Southern Lakes—and warning Alberth, "Any further action taken by you will include a response by [Southern Lakes] with the above information and will also involve your new employer due to your unauthorized removal of [Southern Lakes] files."

(*Id.* at 2–3.) Responding to a request for documents with an apparent threat is hardly a sign of good faith.

In light of these circumstances, I conclude that a statutory penalty is warranted, but I will defer determining the amount of the penalty until after trial.

### 3. Second Claim for Relief: § 502(a)(1)(B)

ERISA § 502(a)(1)(B) permits civil actions by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). This is essentially a claim asserting contractual rights under an employee benefit plan. *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan*, 713 F.2d 247, 252–53 (7th Cir. 1983).

Alberth asserts that the plan entitled him to the cash value of the life insurance policy if he stayed with the company for at least five years. (Compl. ¶ 26; Pl.'s Br. at 13.) Alberth stayed at the company for over thirteen years after the policy became effective, and believes he is accordingly entitled to the cash value. However, summary judgment is not appropriate on this claim because there are genuine issues of material fact about whether a cash value payout option was part of the agreement and, if so, whether Alberth could claim it after he left.

Alberth and other employees testified that they were told or understood that after achieving a certain tenure—Alberth and Neiger claim it was five years—they could opt to receive the cash value of the policy and/or they would "own" the policy or the cash value of the policy would "belong" to them. (Alberth Dep. at 10:3–13, 17:11–18, 25:14–16, 33:14–15; Adams Decl. ¶ 3, Docket # 24; Flitcroft Dep. at 9:3–6 and 16–20, 12:10–19, 15:8–12,

Docket # 42-1; Morgan Dep. at 13:24–25, 14:1–2; Neiger Decl. ¶¶ 4–6).) Supporting their testimony are is the fact that just over five years from the effective date of the policy insuring Morgan, the Plucinskis suggested that Morgan, who was in debt to Plucinski, to take out a loan against his policy. (PPFOF ¶¶ 29–39 and Defs.' Resp. ¶¶ 29–39; Morgan Dep. at 9:9–10.) Ultimately, the Plucinskis surrendered the policy for its cash value and Plucinski appears to have retained a portion of the cash value to satisfy the debt Morgan owed him. (*Id.*) This transaction makes little sense unless Morgan had some claim to that cash value. Given that Plucinski took out the same kind of policy on Alberth at the same time and for the same purpose, a rational factfinder could credit Alberth's assertion that the cash value payout option was part of his arrangement with Plucinski, too. Furthermore, Alberth testified that he understood that his policy would continue when he left the company. (Alberth Dep. at 24:20.) Supporting this understanding are the facts that the policy insuring Alberth remained in effect after he left (Plucinski Dep. at 22:18–20), and that Morgan's receipt of part of the cash value of the policy took place around the time he left the company, though that sequence of events is somewhat unclear.

On the other hand, Plucinksi testified that he said nothing to any employee about a cash payout after a certain number of years and never intended to pay out the cash value of any policy. (Defs.' Br. at 3–5; Defs.' Resp. ¶¶ 13–15, 17, 20, 23, 28, 43–45, 52). At all times, Plucinski appears to have remained the named owner on the policies and paid all premiums. There is evidence that at least one policy was modified to insure a different employee when the originally insured employee left the company (Plucinski Dep. at 12:8–10, 26:23–27:23), suggesting that these plans were not intended to continue when employees left.

In sum, there are genuine issues of material fact about the terms of the plan, including whether it had a cash value payout option and to what extent the plan was intended to continue after employment at Southern Lakes ended. Because Alberth has not met the burden of proving each and every element of his § 502(a)(1)(B) claim, he is not entitled to summary judgment on that claim.

## CONCLUSION

The life insurance policy insuring Alberth was part of an "employee welfare benefit plan" subject to ERISA. The Defendants' refusal to comply with Alberth's request for plan documents violated 29 U.S.C. § 1024(b)(4). However, Alberth is not entitled to summary judgment on his claim for benefits because there are genuine issues of material fact about the terms of this unwritten plan.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Alberth's motion for summary judgment (Docket # 19) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **GRANTED** on Alberth's First Claim for Relief, but the court reserves ruling on the penalty amount. Summary judgment is **DENIED** on Alberth's Second Claim for Relief.

The clerk of court will contact the parties to set a telephone conference to discuss the status of this matter.

Dated at Milwaukee, Wisconsin this 6th day of March, 2020.

BY THE COURT:

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge