UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**RAYMOND ALBERTH,**

    Plaintiff,

    v.                                                                   Case No. 19-CV-62

**SOUTHERN LAKES PLUMBING & HEATING, INC.**
**and SCOTT R. PLUCINSKI,**

    Defendants.

---

## DECISION AND ORDER FOLLOWING COURT TRIAL

---

Raymond Alberth sues his former employer, Southern Lakes Plumbing & Heating, Inc. ("Southern Lakes"), and its owner, Scott R. Plucinski, for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Compl., Docket # 1.) At summary judgment, I determined that there was an ERISA plan in place with regard to the life insurance policy that was purchased and owned by Plucinski insuring Alberth. I also determined that the defendants, in failing to provide a copy of the life insurance policy to Alberth, violated § 502(a)(1)(A). However, I determined that three issues remained for trial: (1) whether the plan had a cash value payout option; (2) whether the cash value benefit continued after the insured's employment ended; and (3) what, if any, penalty should be assessed against the defendants for violation of § 502(a)(1)(A). A trial to the Court was held on November 19, 2020 and the parties were ordered to file post-trial submissions. The matter is now ready for resolution.

# FINDINGS OF FACT

On November 19, 2020, a trial to the Court was held. Scott Plucinski, Patricia Plucinski, Jeffrey Flitcroft, Steven Morgan, Tammy Neiger, and Raymond Alberth testified. The parties also entered into evidence a stipulation of facts. (Docket # 63 and Transcript of Nov. 19, 2020 Court Trial ("Tr.") at 3, 6.) Pursuant to Fed. R. Civ. P. 52(a)(1), I make the following findings of fact based on the evidence presented at trial.

Scott Plucinski began Southern Lakes in 1982. (Stipulation of Facts ("SOF") ¶ 1, Docket # 63.) Alberth was employed by Southern Lakes for over twenty years, from 1997 until September 2018. (*Id.* ¶ 2.) Alberth served as Southern Lakes' HVAC manager. (*Id.* ¶ 3.) In 2004, Plucinski met with an insurance agent for the purpose of providing a benefit to some key employees in the form of life insurance. (*Id.* ¶ 6.) Plucinski purchased life insurance policies for four key employees—Alberth, Flitcroft, Morgan, and Neiger. (SOF ¶¶ 10–11, 17 and Tr. 11.) Plucinski purchased insurance policies for these employees to incentivize them to remain with the company (Tr. 11) and to, "at [his] discretion, award them for their work and performance" (Tr. 32). All four policies were the same type of policy with the same terms. (Tr. 17.) Plucinski explained that he intended to reward his employees so "if they retired and moved on someplace else or whatever, then [he] could have given them some cash value of it." (Tr. 48.)

Southern Lakes paid all of the premiums on the policies (SOF ¶ 8 and Tr. 11–12) and Plucinski personally owed the policies (Tr. 32–33) and exercised discretionary control over the purchase, administration, management, and assets of the policies (SOF ¶ 5). However, the employees were allowed to control the death benefit by naming their own beneficiary. (Tr. 32.) It was up to Plucinski, as the policies' owner, to determine who owned the cash

value of the policies. (SOF ¶ 7.) The effective dates of the policies were as follows: Flitcroft – January 18, 2005; Morgan – February 4, 2005; Neiger – March 3, 2005; and Alberth – March 4, 2005. (SOF ¶¶ 11, 14, 17, 30.)

Two of the employees who received these life insurance policies remain employed at Southern Lakes—Flitcroft (Tr. 73) and Neiger (Tr. 98). Neiger is Alberth's sister. (SOF ¶ 38.) Flitcroft believed that while the specific issue of the cash value of the policy was never discussed, Plucinski "made it sound that it was worth something and there's value there" (Tr. 76–77) and he understood that "if we needed [the money], . . . we could take it out, as long as we're there" (Tr. 77, 79–80). Neiger was told by either Plucinski or his wife, Patricia (who also provided various services for Southern Lakes) (Tr. 69), that the cash value of the policy belonged to her after five years (Tr. 102, 110–11). In 2009, Neiger asked Patricia whether she could withdraw some of the life insurance funds to help pay for additional training for her position with the company. (Tr. 108–109.) Neiger never withdrew the funds because Patricia told her Southern Lakes would pay for her training. (Tr. 109.)

Two of the employees who received these life insurance policies no longer work for Southern Lakes—Morgan and Alberth. Morgan understood that the life insurance policy would accumulate a cash value over time. (SOF ¶ 19.) Morgan believed that "if you worked for the company so many years [the policy's cash value] was going to be turned over to you." (Tr. 85–86.) Morgan left his employment with Southern Lakes in August 2010 (Tr. 86) to take a position at the VA (Tr. 92). He left on good terms with Plucinski, who considers Morgan a friend to this day. (Tr. 34.)

Prior to the effective date of the policy, in 2002, Morgan bought a property in northern Wisconsin that required a down payment. (SOF ¶ 20 and Tr. 33–34, 84.) Morgan borrowed money from Plucinski to make the payment. (SOF ¶ 21.) Morgan, for his part, believed Plucinski cashed out his life insurance policy to provide him with the money. (Tr. 85, 87.) Given that Morgan's life insurance policy was not in effect in 2002, Plucinski could not have cashed out Morgan's policy to provide him with the needed funds. However, when Morgan left his employment with Southern Lakes in 2010, Plucinski believed that Morgan still owned him money for the loan. (Tr. 34.) Morgan paid Plucinski back with the cash value of Morgan's life insurance policy. (*Id.*) The cash value of Morgan's policy was higher than the amount of Morgan's loan (Tr. 35), so Plucinski returned the balance of the cash value to Morgan, totaling $579.30 (SOF ¶¶ 26–27 and Tr. 20, 46).

Alberth understood that he was receiving the life insurance policy as a "key man" of the company to incentivize him to stay employed with Southern Lakes. (Tr. 119.) Alberth believed that at the end of five years, the cash value of the policy would belong to him. (Tr. 171.) Alberth quit his job at Southern Lakes in September 2018. (SOF ¶ 2 and Tr. 117.) On October 22 and 29, 2018, Alberth sent Plucinski emails demanding the policy document and payment of his insurance policy's cash value. (SOF ¶ 31.) On October 31, 2018, Alberth sent an email to Plucinski's attorney, Ted Johnson, renewing his request for a copy of the policy. (*Id.* ¶ 32.) On November 1, 2018, Attorney Johnson responded to Alberth's October 31, 2018 email stating, *inter alia*, "we will not be sending any policy information." (*Id.* ¶ 33.) On November 9, 2018, Alberth's attorney emailed Attorney Johnson as follows: "I represent Ray Alberth regarding the key-man policy that you and he have been communicating about. Please email to me copies of the policy, plan document, summary plan document, and all

communications regarding the policy. Thank you." (*Id.* ¶ 34.) In response to Alberth's attorney, Attorney Johnson provided Plaintiff's counsel with the policy data page. (*Id.* ¶ 35.) On November 9, 2018, Alberth's attorney emailed Attorney Johnson, with an additional request for a copy of the policy. (*Id.* ¶ 36.) Alberth was not provided with a copy of the policy naming Alberth as the insured and related documents until April 16, 2019, in response to Alberth's document requests. (*Id.* ¶ 37.)

Plucinski believed that because Alberth was no longer an employee of Southern Lakes, he was not entitled to the documents requested. (Tr. 28–29.) Plucinski believed that Alberth did not "deserve" any information after he no longer worked for Southern Lakes. (Tr. 29–30.) Plucinski saw Alberth as his competition and Plucinski does not assist his competition. (Tr. 31.)

## ANALYSIS AND CONCLUSIONS OF LAW

1. *The Plan and its Terms*

ERISA § 502(a)(1)(B) permits civil actions by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). This is essentially a claim asserting contractual rights under an employee benefit plan. *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan*, 713 F.2d 247, 252–53 (7th Cir. 1983). For the reasons explained in the summary judgment decision, I determined that the life insurance policy insuring Alberth was part of an "employee welfare benefit plan." However, trial was necessary to determine the terms of the plan, namely, whether the plan had a cash value payout option and whether the cash value benefit continued after the insured's employment ended.

5

Alberth asserts that the plan entitled him to the cash value of the life insurance policy if he stayed with the company for at least five years. Alberth stayed at the company for over thirteen years after the policy became effective, and believes he is accordingly entitled to the cash value. Plucinski denies that there was an agreement to give or pay the cash value to Alberth. After weighing the evidence presented at trial, I find that Alberth has shown by a preponderance of the evidence that a cash value option was part of the agreement with the defendants and that the cash value benefit vested after five years of employment with the company.

It is undisputed that Plucinski obtained, as a perk of employment, life insurance for certain key employees, including Alberth. It is also undisputed that the policies contained a cash value option. The dispute centers on whether the cash value belonged Plucinski or to the employees. I find as a matter of law that while Plucinski owned the policies and could determine who owned the cash value of the policies, he intended the employees to own the cash value. The clearest evidence that the employees owned the cash value of the policies is Plucinski's interaction with Morgan regarding the loan for Morgan's northern Wisconsin property. When Morgan left his employment with Southern Lakes, he still owed Plucinski for the loan. Plucinski cashed out Morgan's policy and used it to pay Morgan's loan. Plucinski then returned the balance of the cash value to Morgan. If Plucinski owned the cash value of the policy, why was he using his own money to pay himself back? He would clearly be entitled to *both* the cash value of Morgan's policy *and* the amount of Morgan's loan. Furthermore, Plucinski returned the balance to Morgan. Why would he do this if he owned the funds? Plucinski's interactions with Morgan make no sense if Plucinski owned the cash value of the policy. At trial, Plucinski testified that perhaps he borrowed against the

policy in order to loan Morgan the money. (Tr. 49.) Plucinski's explanation, however, still does not elucidate cashing out the policy to pay back the loan. If the cash value of the policy did not belong to Morgan, then why would he receive the remainder of the money after satisfying the loan? Plucinski does not explain. The only logical explanation is that the cash belonged to Morgan.

Furthermore, all four employees understood that they had access to the money. Flitcroft believed it was there if they needed it (Tr. 77, 79–80) and Morgan understood that "if you worked for the company so many years [the policy's cash value] was going to be turned over to you" (Tr. 85–86). Both Neiger and Alberth believed they owned the money after five years.

If a benefit "vests," it survives the termination of one's employment. *See Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 363–64 (1980). Under ERISA, life insurance is a "welfare" benefit and thus does not vest automatically. *Int'l Union of United Auto., Aerospace & Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 702 (7th Cir. 2003). Thus, whether the life insurance benefit vests is an issue of contract interpretation. *Id.* Alberth and Neiger credibly testified that the policy benefit vested after five years of employment. (Tr. 102, 110–11, 171.) The fact that neither Flitcroft nor Morgan could remember exactly how many years it took for the policy to vest does not detract from Alberth and Neiger's testimony. Furthermore, Morgan, the only employee to receive the cash value of his life insurance policy, was given the money in August 2010, five years after the policy's effective date of February 4, 2005. Plucinski himself testified that he wanted to use the policies to reward his employees so "if they retired and moved on someplace else . . . then I could have given them some cash value of it." (Tr. 48.) This indicates that Plucinski

intended the employees to keep the cash value of the policy, even beyond their employment with Southern Lakes.

For these reasons, I find that the life insurance policy at issue had a cash value payout option that vested after five years of employment with Southern Lakes. The evidence supports Plucinski's intention for the benefit to survive the employee's termination of employment. Alberth worked for Southern Lakes for more than five years after the effective date of his policy. Thus, the policy vested and Alberth was entitled to the cash value of the policy, even after his employment with the company ended. For these reasons, Alberth is awarded the policy's September 28, 2018 cash value of $32,048.81.

2. *Statutory Penalties*

Alberth argues that he is entitled to statutory penalties of $15,950.00 due to the defendants' failure to comply with Alberth's request for plan documents. At summary judgment, I determined that a statutory penalty was appropriate, but deferred ruling on the amount until after the trial.

Section 502(c) of ERISA, 29 U.S.C. § 1132(c), requires plan administrators to provide information requested by plan participants or beneficiaries within thirty days of such request or face a statutory penalty of up to $100.00 per day. 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B). By regulation, the maximum penalty has increased to $110.00 per day. *Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781, 793 (7th Cir. 2009) (citing 29 C.F.R. § 2575.502c–3). Section 502(a)(1)(A) authorizes a plan participant or beneficiary to sue for these penalties if a plan administrator violates § 502(c). 29 U.S.C. § 1132(a)(1)(A). The decision to impose statutory penalties is committed to the discretion of the district court. *Harsch v. Eisenberg*, 956 F.2d 651, 662 (7th Cir. 1992). In exercising this discretion, the judge

may—but need not—consider whether there is any provable injury. *Harsch*, 956 F.2d at 662 (citing *Ziaee v. Vest*, 916 F.2d 1204, 1210 (7th Cir. 1990)). The court must make factual findings supporting any such penalty it imposes. *Ziaee*, 916 F.2d at 1210–11.

In deciding whether to assess penalties for untimely responses, appropriate factors to be considered include the length of the delay, the number of requests made and documents withheld, whether there is evidence that the administrator acted in bad faith, and whether assessing a fine would further any purpose of ERISA. *Jacobs v. Xerox Corp. Long Term Disability Income Plan*, 520 F. Supp. 2d 1022, 1044 (N.D. Ill. 2007). The Court may also consider whether the plaintiff was materially prejudiced by the delay, although that is not a prerequisite to recovery. *Id.*

The evidence in this case supports a finding that Plucinski acted in bad faith in refusing to provide Alberth with the policy documents. After Alberth quit his employment with Southern Lakes in September 2018, the following month, he sent Plucinski two emails demanding the policy documents, which went unanswered. By the end of October, Alberth emailed Plucinski's attorney, again asking for the documents, to which Plucinski's counsel responded by refusing to provide the information and accusing him of stealing proprietary information from Southern Lakes. (Pl.'s Trial Ex. 10, Docket # 62-10.) In November, Alberth's attorney emailed Plucinski's attorney specifically requesting copies of the policy, plan document, summary plan document, and all communications regarding the policy, to which counsel responded by only sending the policy data page. Alberth's counsel again contacted Plucinski's counsel in November to obtain the documents, but to no avail. Alberth was not provided with a copy of the policy naming Alberth as the insured and related documents until April 16, 2019, in response to Alberth's document requests.

Plucinski's rationale for refusing to provide Alberth the documents came across loud and clear during trial—he twice testified that because Alberth was no longer employed with Southern Lakes, he did not "deserve" the documents. (Tr. 29–30.) Plucinski believed that Alberth took proprietary information from his company and he was angry. (Tr. 30–31.) Plucinski was clear that after Alberth left Southern Lakes he was his competition and Plucinski does not assist his competition. (Tr. 30.) But the bad blood between Plucinski and Alberth is not a legitimate reason for denying Alberth the documents. It was not a matter of what Alberth "deserved"; he was entitled to the documents under ERISA. Because of Plucinski's animus towards Alberth, it took over five requests and 145 days to receive the documents. Given the oral nature of the parties' agreement, the utility of the requested documents is somewhat questionable. However, that fact was likely not entirely clear to Alberth at the beginning of this process. Had Plucinski not stonewalled Alberth, perhaps this matter could have been resolved more quickly.

That being said, the granting of a penalty is discretionary. A fine is not mandatory even upon a statutory violation. *Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 858 (7th Cir. 2002). While Plucinski's contumacious behavior warrants imposition of a penalty, in the end, the agreement was oral and the documents withheld were therefore not dispositive. As such, I will not award the full amount of $15,950.00 sought (which is the statutory daily maximum of $110.00 x 145 days). Rather, I will award $8,700.00, which reduces the statutory daily maximum of $110.00 to $60.00, multiplied by 145 days ($60.00 x 145 days = $8,700.00).

3. *Prejudgment Interest*

Alberth seeks an award of prejudgment interest in the amount of $5,446.94. Defendants do not address or contest Alberth's request. In ERISA cases, there is a presumption in favor of awarding prejudgment interest. *Rivera v. Benefit Tr. Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir. 1991). Whether to award prejudgment interest to an ERISA plaintiff is "'a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities.'" *Trustmark Life Ins. Co. v. Univ. of Chicago Hosps.*, 207 F.3d 876, 885 (7th Cir. 2000) (quoting *Landwehr v. DuPree*, 72 F.3d 726, 739 (9th Cir. 1995)). One of the factors considered in determining whether to award prejudgment interest is the presence of bad faith or good will. *Id.*

Also discretionary is whether to award simple or compound interest, and at what interest rate. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). Alberth calculates an interest rate of 6.48% compounded annually over 2.5 years. He does this by looking at the Seventh Circuit's 2002 *Fritcher* decision in which the court upheld the district court's decision to award prejudgment interest at a rate of 8.33%. *Id.* Alberth reasons that the prime rate in 2001 was 5.1% and today's prime rate is 3.25%, so I should take the difference between the two prime rates (which is 1.85%) and subtract 1.85% from the 8.33% upheld in *Fritcher* to get 6.48%. (Pl.'s Br. at 9 n.1.) While an interesting proposal, I see absolutely no basis to calculate the interest rate this way. The *Fritcher* court upheld the district court's determination of an 8.33% interest rate because it is a discretionary decision and it saw "no reason to disturb" it. 301 F.3d at 820. It is entirely unclear why the district court awarded a rate of 8.33% in that case and Alberth makes no attempt to argue or explain why the analysis should start with this number as opposed to simply using the prime rate.

In the end, I find that an award of prejudgment, compound interest is warranted to compensate Alberth for the lost time value of his money. Had Plucinski provided Alberth with his money when it was requested on October 22, 2018, he could have taken the money and invested it, thus increasing its value. Thus, I will award Alberth compounding interest from October 22, 2018 until the date of the judgment. However, finding no reasonable basis to award an interest rate of 6.48%, I will award the stated prime rate of 3.25%. Using the compound interest calculator cited by Alberth (Pl.'s Br. at 9 n.3), I award prejudgment interest at a rate of 3.25%, compounded annually over 2.6 years (October 22, 2018 until May 13, 2021), which accumulates to $34,827.80 on a principal of $32,048.81. As such, the interest awarded is $2,778.99 ($34,827.80 - $32,048.81 = $2,778.99).

4. *Attorney's Fees*

Under 29 U.S.C.A. § 1132(g)(1), the court, in its discretion, may allow a reasonable attorney's fee and costs of the action to either party. A fees claimant must show "some degree of success on the merits" before a court may award attorney's fees under § 1132(g)(1). *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010). A claimant does not satisfy that requirement by achieving "trivial success on the merits" or a "purely procedural victor[y]," but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a "lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Id.* (internal citation omitted).

Alberth seeks his attorney's fees and requests to file a fee petition. (Pl.'s Br. at 8.) I will allow Alberth to seek his attorney's fees through a subsequent fee petition in accordance with Fed. R. Civ. P. 54(d).

## CONCLUSION

After considering the evidence presented in this case, I find that Alberth has met his burden of proving, by a preponderance of the evidence, that he is entitled to the policy's September 28, 2018 cash value of $32,048.81. I further find that Alberth is entitled to $8,700.00 to compensate him for the defendants' statutory violation of § 502(c) and is awarded $2,778.99 in prejudgment interest.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the Clerk of Court shall enter judgment in favor of the plaintiff and against the defendants in the amount of $43,527.80, consisting of $32,048.81 in benefits owed, $8,700.00 for defendants' statutory violation, and $2,778.99 in prejudgment interest.

Dated at Milwaukee, Wisconsin this 13th day of May, 2021.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge